WALTER J. ROTHSCHILD, Judge.

¡¿STATEMENT OF THE CASE

On November 3, 2004, the Jefferson Parish District Attorney filed a bill of in *1177 formation charging defendant, Roy Pecot, with ten sex offenses. In Count 1, defendant was charged with aggravated crime against nature, in violation of LSA-R.S. 14:89.1. In Counts 2, 3, 5, and 8, defendant was charged with simple rape, in violation of LSA-R.S. 14:43. In Counts 4, 7, and 10, defendant was charged with indecent behavior with juveniles, in violation of LSA-R.S. 14:81. In Counts 6 and 9, defendant was charged with sexual battery, a violation of LSA-R.S. 14:43.1. Defendant pled not guilty to all charges at arraignment.
A bench trial was held as to all ten charges on June 20-23, 2005. The judge rendered a verdict of guilty as charged on all counts. On November 6, 2008, the trial court held a sentencing hearing, allowing testimony from both prosecution and defense witnesses. On that day, the court imposed the following sentences:
Is* Count 1: ten years at hard labor without benefit of parole, probation, or suspension of sentence, to run concurrently with the sentence on Count 2, and consecutively to each of the other sentences;
• Count 2: 20 years at hard labor without benefit of parole, probation, or suspension of sentence, to run concurrently with the sentence on Count 1, and consecutively to each of the other sentences;
• Count 3: 20 years at hard labor without benefit of parole, probation, or suspension of sentence, to run consecutively to each of the other sentences;
e Count 4: three years at hard labor, to run consecutively to each of the other sentences;
• Count 5: 20 years at hard labor without benefit of parole, probation, or suspension of sentence, to run consecutively to each of the other sentences;
• Count 6: five years at hard labor without benefit of parole, probation, or suspension of sentence, to run concurrently with the sentence on Count 7, and consecutively to each of the other sentences;
• Count 7: three years at hard labor, to run concurrently with the sentence on Count 6, and consecutively to each of the other sentences;
• Count 8: 20 years at hard labor without benefit of parole, probation, or suspension of sentence, to run consecutively to each of the other sentences;
• Count 9: five years at hard labor without benefit of parole, probation, or suspension of sentence, to run concurrently with the sentence on Count 10, but consecutively to each of the other sentences; and
• Count 10: three years at hard labor, to run concurrently with the sentence on Count 9, and consecutively to each of the other sentences.

FACTS

In accordance with LSA-R.S. 46:1844 W, the victims and their family members are identified herein by their initials in order to protect their identities.
Counts 1 and 2
C.S. testified her date of birth is June 5, 1989, and she was 16 years old at the time of trial. She met defendant, Roy Pecot (a/k/a “Rick”), through her former best friend, J.W.[1] C.S. also knew defendant’s teenage son, Billy. She spent time at the apartment where defendant and Billy lived on Clearview Parkway. On one |4occasion in July of 2004, C.S. planned with J.W. to go to defendant’s apartment to hang out. J.W. could not go due to a medical emer *1178 gency, so defendant picked up C.S. and drove her to Ms apartment. C.S. watched television with defendant. Defendant began pouring shots of Jack Daniels, and he offered some to C.S.C.S. drank four or five shots, and she felt dizzy and nauseous. She told defendant she felt sick, and she went to the bathroom and vomited.
C.S. testified that defendant followed her into the bathroom. Defendant took off her pants and underwear and performed oral sex on her, putting his mouth on her vagina. Defendant then held her wrists and penetrated her with his penis. C.S. testified she did not want defendant to do those things, but she allowed it because she was dizzy from the alcohol and she was afraid he would hurt her if she did not submit. She did, however, tell defendant to stop when he penetrated her. C.S. told defendant to get off of her because she was going to vomit, so he left the bathroom.
On July 11, 2004, C.S. told J.W. what defendant had done to her. J.W. told her mother, M.W. On the following day, C.S. told her own mother about what had happened, and her mother contacted police. Officers reported to her house, and C.S. told them what defendant had done to her. C.S. spoke with Detective Donald Zanotel-li, who interviewed her in an unmarked police car. She later met with a Detective Hullihan, who conducted a recorded interview with her. C.S. also underwent a gynecological examination at Children’s Hospital in New Orleans.
C.S.’s mother, M.S., testified that on July 12, 2004, C.S. told her that defendant had molested her. C.S. reported that defendant pulled down her pants and penetrated her. As he did that, C.S. told him no. Defendant apologized to C.S. and left the room. M.S. testified that she informed police of the incident.
Detective Donald Zanotelli testified he is assigned to the Personal Violence Unit of the Jefferson Parish Sheriffs Office. On July 12, 2004, he began a follow-|ups investigation of C.S.’s incident. He went to C.S.’s residence and interviewed her in the back of a patrol car. Detective Zanotelli testified that Detective Hullihan took a formal, tape-recorded statement from C.S. on July 15, 2004.
Counts 3 and 4
J.W. testified her date of birth is January 25, 1988, and she was 17 years old at trial. J.W. met defendant, whom she calls “Rick,” through his son, Billy, when she was 14. She met Billy through her friends, A.K.[2] and Brandon. When she met defendant and his son, they lived on Ligustrum Street in Metairie. On September 28, 2002, J.W. and A.K. decided to run away from home, and they spent that night in a friend’s camper. On the following night, defendant and Billy went to the camper and invited the girls to stay at their house. At defendant’s house, the group drank shots of Goldschlager liqueur. Defendant encouraged the girls to drink, and J.W. got very drunk, became sick, and vomited. J.W. and A.K. slept in Billy’s room that night, while Billy and defendant slept in the living room.
J.W. and A.K. were still at defendant’s house on September 30, 2002. On that night the girls again slept in Billy’s room. Defendant woke J.W. during the night and asked her to watch a Freddie Krueger movie with him in the living room. J.W. agreed. J.W. told defendant she had a hangover, and he encouraged her to drink some shots of Goldschlager, telling her it would make her feel better. J.W. drank three or four shots, and she felt lighthead *1179 ed. She could not move her body and was drooling from her mouth. She did not know if defendant put something in her drink. J.W. testified that defendant removed his pants and the pajama pants she was wearing. He then got on top of her and had sexual intercourse with her. J.W. did not want to have sex with defendant, and she mumbled “no” to him. She was incapable of resisting at that time.
| (¡Defendant took J.W. out for breakfast and apologized to her. He said that if anyone learned he had had sex with her, Billy would have to live with his mother, who was a heroin addict. Defendant also told J.W. he would put a gun to his head if he were found out.
J.W. testified that she and A.K. decided to return to their own homes on October 1, 2002. J.W. did not immediately tell her mother what defendant had done to her. She continued to go to defendant’s house, and she and Billy dated. Defendant often picked her up at her house and drove her to his house. On one occasion, when they were alone in his truck, defendant threatened to tell Billy he had seen her kissing another boy if she did not perform oral sex on him. Defendant touched her breasts and her legs. J.W. refused to perform oral sex on defendant.
J.W. testified that in January of 2003, she was admitted to River Oaks Hospital, a psychiatric facility. In May of 2003, she told her mother’s roommate, Andrea Graham, about what defendant had done to her. Ms. Graham insisted that J.W. tell her mother. J.W.’s mother notified the police, but J.W. refused to cooperate with the investigation at that time.
J.W. stated that defendant’s house was where many of her friends went to party, and defendant gave them liquor. J.W. used drugs at his house, including cocaine and marijuana. Defendant bought her “zanbars”, Valium, Soma, and Ecstasy on request.
J.W. testified that C.S.[3] is her best friend. J.W. arranged for C.S. to spend a night with her at defendant’s house. However, J.W. ended up spending part of that night in a hospital emergency room. When J.W. arrived at defendant’s house later that night, C.S. was passed out. Defendant told J.W. that C.S. had decided to “get with him,” and he and C.S. had been together. When J.W. asked C.S. what had 17happened, C.S. cried and told her defendant had gotten her drunk and had given her marijuana. According to C.S., defendant performed oral sex on her, and then penetrated her with his penis, but she refused to let him continue. On the next day, J.W. and C.S. told C.S.’s mother what defendant had done to them. J.W. gave statements to Detectives Hullihan and Za-notelli.
J.W.’s mother, M.W., testified that J.W. was admitted to River Oaks Hospital in January of 2003 after she cut herself. For some time after her release from River Oaks, J.W. displayed signs that something was bothering her. In May of 2003, J.W. told her mother that defendant had raped her. When M.W. initially reported the incident with defendant to police, J.W. refused to speak to detectives for fear that Billy would lose his father. M.W. testified that J.W. continued to date Billy, and she forbade her daughter to go to defendant’s house. M.W. later learned J.W. was sneaking to defendant’s house, and that defendant was picking her up to take her there. M.W. then made it a practice to go to defendant’s residence, which at that time was on Clearview Parkway, on a regular basis to keep an eye on J.W.
*1180 On July 11, 2004, M.W. learned about what defendant did to C.S. at his apartment. M.W. drove to defendant’s apartment and picked up C.S. The next day, M.W. drove C.S. home, and they told C.S.’s mother what defendant had done to her. C.S.’s mother then notified police. When detectives later questioned M.W. about C.S.’s case, she reminded them of J.W.’s accusations against defendant. At that point, J.W. was willing to go forward with charges against defendant.
Count 5
A.K. testified her date of birth is August 19,1987. She was 17 years old at the time of trial. She met defendant, whom she knows as “Rick,” when she was 15 years old. She is a friend of defendant’s son, Billy, whom she first met on September 28, 2002. On the following night, she and J.W. ran away from home 18and stayed in a friend’s camper. On their second night in the camper, Billy came to ask them to stay at his house. A.K. and J.W. went with Billy and defendant to their house. When they arrived, defendant offered the girls Goldschlager. A.K. began by drinking half shots, but defendant ridiculed her so she began drinking whole shots. She became drunk and vomited everywhere.
A.K. testified that she and J.W. spent three nights at defendant’s house. On the third night, A.K. drank Goldschlager shots with defendant after J.W. went to sleep. She blacked out and awoke to find defendant was on top of her having intercourse with her. A.K. testified she felt paralyzed, as if she were dead. She was unable to move or talk. A.K. passed out again. When she awoke, she was in a bed in Billy’s bedroom, fully clothed. A.K. believed defendant put something in her drink, since alcohol alone would not have had such a paralyzing effect on her.
A.K. testified that she did not immediately tell anyone what had happened. In the morning, she and J.W. decided to go home. A.K. and J.W. later discussed calling the police about what defendant had done to them, but they were both afraid of him. A.K. testified that she continued to visit defendant’s house after the incident to hang out with Billy and his friends. She was not afraid defendant would do something to her, since he was not usually at home when she was there.
A.K. did not disclose the rape to police until July of 2004. Detective Zanotelli testified that Detective Hullihan met with A.K. on July 13, 2004 and interviewed her.
Counts 6 and 7
C.T. testified her date of birth is December 15, 1987. She was 17 at the time of the trial. In January of 2003, at age 15, C.T. was admitted to River Oaks Hospital. At that time, she was suffering from depression and stress related to an accident. Her roommate during her stay was J.W, and C.T. met defendant when he Rvisited J.W. Defendant told C.T. that he and his son had parties at his house, and C.T. would be welcome.
C.T. testified that she phoned J.W. when she was released from River Oaks, and J.W. invited her to a party. Defendant and J.W. went to C.T.’s house to pick her up, and they went to the Shoney’s Inn on Clearview Parkway. Defendant told C.T. they were there to “get a buzz on” before going to the party. At the motel, defendant took out a bottle of Goldschlager and poured shots for C.T. and J.W. C.T. had between five and ten shots. Defendant encouraged her to drink and told C.T. and J.W. to “make out.” C.T. stated that J.W. was all for it, but C.T. was not.
When J.W. went into the bathroom, C.T. testified she laid down on one of the beds, and defendant sat next to her. He started rubbing her leg. C.T. pushed his hand away and told him to stop. Defendant *1181 said “okay,” and he moved his hand away. He then put his hand further up her leg. Defendant put his hand under her shirt and touched her breast. She again told defendant to stop, but he did not comply. Defendant put his hand under C.T.’s shorts and underwear, and he touched her vagina. She screamed, “ ‘No, you’re not respecting me, please respect me.’ ” C.T. called for J.W. and said she wanted to leave. Defendant apologized and begged C.T. not to tell anyone what had happened.
C.T. testified that she, J.W., and defendant left the motel and went to defendant’s house. C.T. was dizzy from the alcohol, and she vomited. Two other girls, M.D.M. and A.K.,[4] entered the bathroom. When C.T. told them what defendant had done, they told her she was one of the lucky ones; that defendant had touched them too, but he had gone further with them. Billy also entered the bathroom. When C.T. told him what his father had done, he became angry and began to cry.
| mC.T. told defendant she was going to disclose what he had done to her. Defendant apologized again, and begged her not to tell anyone for Billy’s sake. C.T. slept on Billy’s bedroom floor that night. Defendant drove her home the next morning and again begged her not to tell anyone what he had done.
C.T. reported the incident to police in May of 2003, but the police dropped the matter at that time. A detective later contacted her about the case. On July 28, 2004, C.T. met with the detective and submitted to a tape-recorded interview.
Count 8
M.D.M.[5] testified her date of birth is August 7, 1987. She was 17 years old at trial. M.D.M. met defendant, known as “Rick”, when she was 15 years old. In November of 2002, J.W. invited her to a party at defendant’s house, and J.W. and defendant picked her up. M.D.M. testified that instead of going to his house, defendant drove the girls to a Shoney’s Inn. With defendant’s encouragement, she drank shots of Goldschlager. After drinking four or five shots, she blacked out. Defendant woke her later, and she asked where J.W. was. Defendant told her he had taken her to see Billy.
M.D.M. testified that defendant began to rub her back. Then he took off her shirt and her bra. She did not want him to do those things, but she could not stop him. She felt dead. She has had liquor since that night, and it has never made her feel like that. M.D.M. blacked out again, and the next time she awoke, she was lying on her back, naked, and defendant’s face was close to hers. Defendant said, “ T have to use a condom, I have to use a condom.’ ” She recalled getting dressed and going into the bathroom to vomit. Defendant threw a condom into the toilet when she flushed it. M.D.M. later felt discomfort in her vaginal area, as if she had had rough sex. She testified that she is sure defendant had sex with her.
|1TWhen M.D.M. and defendant left the motel, defendant said, “You’re not going to tell anybody.” He then said, “Well, you’re not going to remember this anyway.” Defendant drove M.D.M. to his house. M.D.M. did not want to go home that night, because she was drunk. She spent the night in Billy’s room and, in the morning, defendant drove M.D.M. and J.W. to J.W.’s house.
*1182 M.D.M. testified she did not immediately tell anyone what defendant had done to her because she was afraid of him. The first person she told was her friend, A.K.[6] She and A.K. discussed with each other their experiences with defendant. M.D.M. first talked to police about what defendant had done to her in 2004, around the time of C.S.’s[7] disclosure to police.
M.D.M. continued to go to defendant’s house after defendant had sex with her, because her friends hung out there, and defendant was rarely there. She never drank with defendant again, and she made sure she was not alone with him.
Counts 9 and 10
M.M. testified her date of birth is June 26, 1986, and she was 18 years old at trial. M.M. knows defendant as “Rick”. She met him through her friend, A.K.[8] In November of 2002, M.M., who was 16, went to defendant’s house with A.K. A group of young people were hanging out there. As the evening progressed, the group began drinking.
Defendant approached M.M. and asked her to go into the living room with him to talk. M.M. agreed. Defendant asked her to go out to a bar with him and said he knew of a bar he could get her into because his friend worked there. M.M. told defendant she was interested in going to this bar because she had never been to a bar before, and she thought it would be fun. Defendant showed M.M. a [^pornography channel on his television, and she asked him to change the channel. Defendant responded, “What, you don’t like that? You know you do.” After a while, defendant turned off the pornographic program.
Defendant picked up M.M. the following night. She told her parents he would be taking her to an arcade for a birthday party. M.M. testified that defendant did not take her to a bar, but to the Shoney’s Inn. He told her they were there because his daughter had requested a hotel party, and they would wait there for the other guests. In the motel room, defendant poured her some Goldschlager. When she was slow to drink it, defendant taunted her to drink more. She drank three or four shots and felt flushed and dizzy, so she laid on one of the beds. Defendant approached and asked if she wanted a back massage. When M.M. told him she did not want a massage, defendant said, ‘Yeah, come on ... you know you want one.” M.M. testified that defendant sat on her backside and started rubbing her back and shoulders. He touched her backside and between her legs on the outside of her clothing. . Defendant put his hand down the back of her pants. He put his hand under her shirt and bra and touched her breasts. When defendant touched her breasts, M.M. rebuked him loudly, so he stopped. Defendant and M.M. left the motel and went to defendant’s house. Defendant told M.M. not to tell anyone what he had done because Billy would have nowhere to go.
When defendant and M.M. arrived at his house, Billy and some other teenage boys were there. M.M. did not stay overnight; she went home. She did not tell her mother that defendant had touched her because she was afraid of being punished for lying about where she was going. She told her mother a few weeks later. She did not speak to police at that time. M.M. first spoke to Detective Zanotelli in July of *1183 2004. The officer got her name from her friend, A.K.
| isL.M. testified she is M.M.’s mother. L.M. testified that in early 2003, after her contact with defendant, M.M. began to have problems. M.M. told her and her husband that she was depressed and felt suicidal. Two stays at River Oaks Hospital followed. In July of 2004, M.M. told her mother that defendant had tried to rape her, and that she was not the only one defendant had victimized. M.M.’s disclosure was prompted by the fact that other victims had come forward.
Detective Zanotelli testified that he met with M.M. on July 29, 2004, and interviewed her. Detective Zanotelli stated that he obtained a search warrant for defendant’s residence. He executed the search warrant on July 23, 2004, with several other officers. Among the items collected in the search were a computer, two bottles of Hpnotiq liqueur, bottles of vodka and cognac, some “Girls Gone Wild” DVDs, two “Nightmare on Elm Street” DVDs (i.e., “Freddie Krueger” movies), and receipts from Shoney’s Inn bearing defendant’s name.
The Defense
William “Billy” Pecot testified that defendant is his father. He stated his date of birth is October 22, 1987, and he was 17 years old at trial. His parents divorced when he was 13 years old. He initially lived with his mother, but then moved in with his father and his sister, Elizabeth.
Billy stated that he met J.W. when they were both 14 years old. They have dated off and on since then, and they cohabited for a time at defendant’s home. Defendant first met J.W. when they went to pick up J.W. and A.K. from the camper where the girls were staying. When they returned to defendant’s house, they all drank. Defendant poured liquor into shot glasses and encouraged the girls to drink. J.W. threw up. Afterwards, they all went to sleep. The girls slept in his bedroom, and defendant slept in the living room.
| uBilly testified that, at the time, the girls did not tell him about anything that happened to them. About six months later, J.W. told Billy defendant had raped her on the second night she stayed with them. J.W. said she believed defendant put something in her drink. Billy stated that he believed J.W. at first, and he confronted defendant. Defendant denied doing anything to J.W. Billy said he believed J.W.’s story at first because he was in love with her. When he was interviewed, Billy told Detective Zanotelli that he believed J.W.’s story. He also told the detective that the parties at defendant’s house had gotten worse and worse, and that defendant had cocaine and marijuana at his house. At trial, Billy testified that he had lied to the detective, because he was angry ■with defendant at the time.
Billy testified that he has come to doubt J.W’s story. J.W. told- Billy she was not really raped by defendant because she did not say no. Billy also recalled that on the night defendant allegedly raped J.W., she came to Billy’s bedroom and started messing around with him. She was touching him in a sexual way, but he wanted to go to sleep. J.W. spent the night in Billy’s bed with him.
Billy testified he met C.T. at River Oaks when he and defendant went there to visit J.W. One night he found C.T. in the bathroom at defendant’s house. She was very upset, and she said defendant had tried to touch her. According to C.T., defendant had stopped when she told him no. Billy stated that he did not believe C.T. because she is “pretty crazy.”
Billy does not think defendant raped any of the girls, because he does not believe his father is capable of that.
*1184 Frances Weber testified she is 20 years old, and she knows defendant through his daughter, Elizabeth (“Liz”). Ms. Weber lived at defendant’s house from January to March of 2002 when she was 16, and she went there often while Liz lived there. Ms. Weber testified that she was alone in the house with defendant 117iat times, and she sometimes drank with him. She and other girls sometimes played “strip poker,” but defendant did not do anything to her that he should not do. Ms. Weber testified that she is aware that defendant is accused of raping J.W. She surmised that defendant may have tried something with J.W. because J.W. was always “putting it out there” by wearing skimpy outfits.
Joy Pecot testified she is defendant’s ex-wife. She and defendant divorced in 2000 after about 20 years of marriage. They shared custody of their son, Billy. Their daughter, Elizabeth, mostly lived with defendant. Ms. Pecot testified she knows J.W., who is Billy’s ex-girlfriend. Ms. Pe-cot stated that during the summer of 2004, shortly before defendant’s arrest, she went to defendant’s house to ask him to repay some money he owed her. She arrived there to find defendant and J.W. leaving in defendant’s truck. Ms. Pecot followed them. Defendant stopped in the parking lot of the apartment complex where J.W.’s mother lived. Ms. Pecot saw defendant and J.W. kiss. Then J.W. moved as if she were taking off her pants. J.W. laid back in the truck, and defendant got on top of her. Ms. Pecot saw something thrown out of a window of defendant’s truck. After defendant drove away, Ms. Pecot walked over to the object and saw it was a condom. She never reported the incident to police, because she did not want to hurt Billy. Ms. Pecot does not believe defendant raped anyone or that he is capable of rape. She believes that the sexual encounter she saw between defendant and J.W. was consensual.
Elizabeth Pecot, defendant’s daughter, testified that after her parents’ divorce, she lived with defendant until she was 19 or 20 years old. She testified that defendant allowed her and her friends to drink alcohol at his house because he preferred that they did it where he could supervise them. Defendant also had marijuana at his house on occasion, as well as Ecstasy and cocaine.
| ,fiElizabeth stated she was living with defendant in October of 2002, when J.W. and A.K. were there as guests. At that time, Elizabeth and her boyfriend were caring for his newborn baby by a former girlfriend. Elizabeth was up every two hours at night caring for the infant. She never saw J.W. watching television alone with defendant. She testified that, in her experience, J.W. was never sober.
Kevin Hawxhurst testified he is a friend of defendant’s son, Billy, and he is currently incarcerated for unauthorized use of a motor vehicle. He testified that C.S. was his girlfriend at one time. She informed him that defendant had raped her, but she told him more than one version of the incident. Mr. Hawxhurst testified that the girls who hung out at defendant’s house flirted with defendant, running around the house wearing underwear and nightclothes.
Defendant testified that was 44 years old at the time of trial. He dropped out of school in the tenth grade. He cannot read or write, and he was able to get a G.E.D. only because he had someone take the test for him. He has been an iron worker with Boh Brothers for 25 years.
Defendant testified he had a sexual relationship with Billy’s girlfriend, J.W. He met J.W. when he and Billy picked up her and her friend, A.K., at a trailer at Billy’s friend’s house. Defendant admitted to breaking the law by serving alcohol to *1185 minors. He did not force J.W. or A.K. to drink, nor did he tell them not to drink. When J.W. and A.K. first spent the night at his house, J.W. told him she was nearly 18 and A.K. was 18 years old. He later learned they were younger than that.
Defendant testified he did not have sex with J.W. and A.K. until the second or third weekend they stayed at his house. A.K. approached him wearing a t-shirt and panties. She took off her panties, and he penetrated her but then stopped. A.K. left the room, but she returned 20 minutes later. She asked defendant if he wanted to do it again, and he told her he did not, and that they should not have 117done it the first time. Defendant stated that A.K. continued to come to his house after that. He did not have any more sexual encounters with her.
Defendant testified that he later had sexual relations with J.W. He did not rape her; their sexual encounter was consensual. J.W. was not drunk or incapacitated at that time. Defendant had sex with J.W. for one to one and one-half years. Eventually J.W. moved into his house with him and Billy. When asked about the incident his ex-wife said she had witnessed, defendant admitted that Ms. Pecot’s description of the incident was accurate.
Defendant testified he knows C.T. He met her only twice: in the hospital when he visited J.W., and when he took C.T. and J.W. to the motel. The girls drank Gold-schlager in the room, and they started making out with each other. Both girls were wearing only panties. J.W. went into the bathroom, and defendant was uncomfortable being left alone with C.T., so he left the room.
With regard to M.M.’s allegations, defendant testified that he did not promise to take M.M. to a bar. He was supposed to take the girls to an arcade. After he picked up M.M., M.M. told him J.W. had said they were going to get a hotel room. Defendant took M.M. to Shoney’s Inn, but J.W. did not show up. Defendant stated he and M.M. drank a couple of shots. She told him about her back problems, and he offered to give her a massage. M.M. said yes, and she laid on the bed and pulled her shirt over her head. Defendant rubbed her back, and he unintentionally touched the sides of her breasts. M.M. was wearing a bra. M.M. was somewhat upset, so defendant apologized. Then, defendant and M.M. went to his house. The other kids had gathered there, and they all went back to the motel.
With respect to C.S., defendant testified she phoned his house and told him J.W. wanted him to pick her up so she could spend the weekend at his house. Defendant picked up C.S. and took her to his home. Defendant testified that on the | 1snight she claims he raped her, C.S. did a striptease for him. She took off her pants and danced. Assuming she wanted to have sex with him, defendant unzipped his pants. C.S. told him no, so he did not have sex with her.
Defendant testified he took M.D.M. and J.W. to Shoney’s Inn one night after M.D.M. had been coming to his house for a while. M.D.M. and J.W. both took zan-bars before they got there. J.W. asked defendant to take her home while M.D.M. was taking a shower. He took J.W. to his house and then returned to the motel room. M.D.M. complained that boys did not like her because she was heavy. She told defendant, “I could f* *k good. I could give you a good head.” M.D.M. said, “Let me show you.” Defendant responded, “All right, go ahead.” Defendant testified that M.D.M. began to perform oral sex on him. She stopped to put a condom on him. Then she got on top of him and they had sexual intercourse.
*1186 Defendant testified that on one occasion, J.W. asked him if C.S.’s boyfriend could spend the night at his house. Defendant told her no, because he had banned the boy from his house. J.W. responded, “I wouldn’t piss [C.S.] off right now.” Defendant told J.W. that C.S. would have to leave his house. The next thing he knew, all of the teens were gone. The day after that, he got home from work to find J.W., C.S., Billy, J.W.’s mother, and the mother’s roommate were all there. He told them to leave, and they complied. J.W. later returned to tell defendant she had filed charges against him with the police.

LAW AND DISCUSSION

In his first assignment of error, defendant argues that he did not knowingly and intelligently waive his right to a jury trial, because he is essentially illiterate. He claims that a head injury he sustained years ago affected his cognitive abilities and that, although he told the trial judge he had obtained a G.E.D., he actually had another person take the test for him. The State responds that defendant made a h ¡¿knowing and intelligent waiver of his right to a jury trial after the trial court fully explained his rights. The State further argues that defendant’s responses during the court’s pre-trial colloquy and his trial testimony demonstrated defendant had sufficient cognitive capabilities to make a valid jury waiver.
Prior to the commencement of trial, defense counsel informed the trial court that he thoroughly discussed the matter with defendant and that defendant wished to waive his right to trial by jury in this case. Defense counsel further indicated that, based on his discussion with defendant, he believed waiving a jury was appropriate for him to do and that defendant was knowingly and intelligently waiving his right to trial by jury. Thereafter, the trial judge conducted the following colloquy with defendant:
THE COURT:
Mr. Pecot, you have discussed that issue thoroughly with your attorney? THE DEFENDANT ROY PECOT:
Yes, sir.
THE COURT:
The fact that you have a right to a trial by jury?
THE DEFENDANT ROY PECOT:
Yes, sir.
THE COURT:
That with regard to some of these cases which a sentence would be manda-torily at hard labor, your right to a trial by jury would mean that a jury would be seated, would hear the case and at least ten out of twelve jurors would concur or must concur in order to reach a verdict;
Do you understand that?
THE DEFENDANT ROY PECOT:
Yes, sir.
THE COURT:
And with regard to a judge trial, it is the judge, in this case this judge, who would decide the issue of guilt or not guilty, or guilty as to any other possible charges, lesser offenses.
UnTHE DEFENDANT ROY PECOT:
Yes, sir.
THE COURT:
Do you understand that?
THE DEFENDANT ROY PECOT:
Yes, sir.
THE COURT:
And you wish to waive your right to a jury?
THE DEFENDANT ROY PECOT:
Yes, sir.
THE COURT:
What is your education level, Mr. Pe-cot?
*1187 THE DEFENDANT ROY PECOT:
Excuse me?
THE COURT:
What is your education level?
THE DEFENDANT ROY PECOT:
I got my — I got a G.E.D., but I lost— I got injured back in the '80s and I lost a lot of knowledge of my reading and that.
THE COURT:
I really couldn’t hear you.
THE DEFENDANT ROY PECOT:
But I did get a education, I went and got a G.E.D.
THE COURT:
You have a G.E.D.?
THE DEFENDANT ROY PECOT:
Yes, I do.
THE COURT:
All right. And as you said, you’ve spoken to [defense counsel] thoroughly concerning the issue of waiving a jury trial, you’ve talked about both sides of the issue?
THE DEFENDANT ROY PECOT:
Yes, I have talked to him about it.
THE COURT:
Going to trial with a jury and going to trial without a jury?
ImTHE DEFENDANT ROY PECOT:
Yes, sir, I talked to him about that.
THE COURT:
And you believe it’s in your best interest to waive a jury and go to trial before the Court in this matter?
THE DEFENDANT ROY PECOT:
Yes, sir.
THE COURT:
All right, very well. We’ll proceed.
Although the right to a jury trial may be waived in non-capital cases, it must be “knowingly and intelligently” waived. LSA-C.Cr.P. art. 780 A; State v. Kahey, 436 So.2d 475, 486 (La.1983). Waiver of this right must be express, and cannot be presumed. State v. McCarroll, 337 So.2d 475, 480 (La.1976); State v. McCloud, 07-936, p. 5 (La.App. 5 Cir. 3/11/08), 978 So.2d 1139, 1140, writs denied, 07-1274 (La.3/24/08), 977 So.2d 950, 08-1137 (La.2/13/09), 999 So.2d 1142.
On appeal, defendant seems to suggest that the trial court was required to inquire further into his educational background and his level of understanding and intelligence. However, this Court has held that the trial judge’s determination as to whether the defendant’s jury trial waiver is knowing and intelligent does not require a Boykin-like colloquy.[9] A trial judge is not obligated to conduct a personal colloquy inquiring into the defendant’s educational background, literacy, and work history. State v. McCloud, 07-936 at 5, 978 So.2d at 1140-41. See also State v. Williams, 07-0700, p. 14 (La.App. 4 Cir. 2/13/08), 977 So.2d 1101, 1112-13.
In this case, the record shows the trial judge fully explained to defendant what his right to a jury trial entailed, and what it would mean to waive that right. Defendant indicated at each step that he understood what the judge told him. The | atrial judge also inquired about defendant’s education level, and defendant stated that he had obtained a G.E.D. Moreover, defense counsel informed the judge that he had thoroughly discussed with defendant the issue of jury waiver. Defendant’s responses during the pre-trial colloquy, as well as his trial testimony, indicate that he understood the proceedings.
Defendant further notes that the trial judge is the same judge who presided over *1188 his divorce proceedings years earlier. He admits that this point was not raised during his pre-trial discussions with defense counsel, nor did he discuss with counsel the fact that he had someone take the G.E.D. exam for him. Defendant seems to suggest that these points negated the knowing and intelligent nature of his jury waiver. However, he does not show how those details, if true, affected his ability to understand and knowingly waive his right to a jury trial.
Based on the foregoing, we find that defendant’s jury waiver was knowingly and intelligently made. This assignment of error is without merit.
In his second assignment of error, defendant contends he was deprived of his right to present a defense by the trial court’s improper application of the Rape Shield Law (LSA-C.E. art. 412) and the hearsay rule. Defendant argues his defense was that the teenage victims were experienced consumers of alcohol and drugs. He claims that the girls’ tolerance to those substances was such that, even though they were drinking at the time of the alleged offenses, they were not so intoxicated that they could not consent to engaging in sexual activity with him. Defendant maintains that in order to prove his case, it was necessary that he be allowed to testify to what the victims said and did at the time of the offenses. He asserts that the trial court’s rulings prevented him from presenting such evidence.
The State responds that defendant did not preserve these issues for appeal, since he did not make timely objections at trial. The State further argues that the lutria! court did not err in ruling the evidence at issue was inadmissible under the Rape Shield Law, since defendant failed to demonstrate that it fell under the exceptions enumerated in LSA-C.E. art. 412 B, and defendant also failed to comply with the procedural requirements of LSA-C.E. art. 412 C. As to the testimony the trial court excluded on the basis of hearsay, the State argues that defendant fails to show that said testimony was admissible under any of the valid hearsay exceptions.
All of the trial court rulings of which defendant complains were made in the course of defendant’s testimony. First, defense counsel asked defendant whether his relationship with J.W. ever involved other girls. Defendant testified that J.W. “wanted to have sex with another girl.” Defense counsel asked defendant if that had happened in his presence, and defendant said it had. When counsel asked defendant to describe that occurrence, the prosecutor objected, citing the Rape Shield Law. The trial court sustained the objection, and defense counsel requested a sidebar.
Defense counsel argued he was trying to elicit what happened in the hotel room when defendant allegedly molested C.T. The prosecutor responded that the testimony defense counsel was trying to elicit had to do with alleged sex acts between two of the victims and that any evidence about sexual conduct other than that connected with the charged offense is barred by the Rape Shield Law. Moreover, the defense had not applied for a hearing under LSA-C.E. art. 412. The trial court maintained its ruling, explaining that what defense counsel was trying to get into was not part of the charged offense, but had to do with sex between two of the alleged victims. Defense counsel did not object. Instead, he stated that he would rephrase his question.
Further along in his examination, defense counsel asked defendant, “How did you end up in a motel room with [C.T.] and [J.W.]?” Defendant responded, in Impart, “Before we went to go pick [C.T.] up, [J.W.] wanted to get a room. And she *1189 said, you know, she wanted to get with [C.T.], because — The prosecutor objected, and the trial court sustained the objection. Again, defense counsel failed to object to the court’s ruling.
When defendant asked whether he could finish explaining what happened before they got to the hotel room, counsel told him, “No. Just well, you can tell me what you did.” Defendant testified, “Well, before I went and got the room, [J.W.] wanted to get the room. She said because — .” The prosecutor again objected, and the trial court sustained the objection. Defense counsel did not object to the court’s ruling. Instead, he told defendant, “Sir, don’t say what she said.”
Soon thereafter, defendant testified that C.T. and J.W. “started making out. They got undressed. They got in the — .” The State objected, and the court sustained the objection. Again, defense counsel failed to object to the court’s ruling. Defendant then testified that it was not, as C.T. had testified, his idea for the two girls to make out; it was J.W.’s idea. The State objected, and this time the court overruled the objection.
Defense counsel asked defendant whether C.T. was telling the truth when she testified that J.W. was in favor of making out with her, and defendant responded, “Yes, because J.W. — I was told — .” The prosecutor made a hearsay objection, which the court sustained. Defense counsel did not object to the ruling.
When defense counsel asked him about being in a motel room with M.D.M. and J.W., defendant testified, in part, that he and J.W. picked up M.D.M., and he got the girls a Coke so they could swallow zanbar pills. Defendant went on to say that they went to the motel room, and the two girls “just started making out.” The prosecutor objected, and the court sustained the objection. Defense counsel did not object to the ruling. Defendant further testified that M.D.M. and J.W. went into |2r,the bathroom in the motel room. When they came out minutes later, J.W. said, “Bring me over by” The prosecutor made an objection, which the court sustained. Defense counsel did not object to the court’s ruling.
Defendant later began to testify about how J.W. sometimes solicited him to have sex with her in an empty apartment next door to his. Defendant stated, “She said, ‘We’ll go next door and open the’ ”. The prosecutor objected, and the trial court sustained the objection. Defense counsel failed to object to the ruling.
Shortly thereafter, defendant attempted to testify to what J.W.’s mother’s roommate told him during a conversation at his residence. The prosecutor objected, and the court sustained the objection, admonishing defendant yet again that he could not “tell us what other people said.” The judge further commented, “It’s not that hard.” Defense counsel did not object to the ruling.
In order to seek appellate review of an alleged trial court error, a party must make a contemporaneous objection at trial, and he must state the grounds for the objection. LSA-C.Cr.P. art. 841; State v. Gaal, 01-376, p. 17 (La.App. 5 Cir. 10/17/01), 800 So.2d 938, 949, writ denied, 02-2335 (La.10/3/03), 855 So.2d 294. The purpose behind the contemporaneous objection rule is to put the trial judge on notice of the alleged error so that he or she may cure the problem, and to prevent the defendant from gambling on a favorable verdict, then resorting to an appeal based on errors that might easily have been corrected by a timely objection. Id.; State v. Norwood, 99-136, p. 5 (La.App. 5 Cir. 8/31/99), 742 So.2d 993, 995.
*1190 In the instant case, defendant failed to timely object to any of the trial court rulings he now claims were erroneous. Accordingly, these issues have not been preserved for review on appeal. See LSA-C.Cr.P. art. 841; LSA-C.E. art. 108 A(2); State v. Yrle, 04-900, pp. 7-8 (La.App. 5 Cir. 3/29/05), 901 So.2d 470, 474, writ denied, 05-2160 (La.5/5/06), 927 So.2d 306.
LfiWe further note that defendant also failed to comply with the procedural requirements of LSA-C.E. art. 412, commonly called the Rape Shield Law. LSA-C.E. art. 412 provides that before a person accused of committing a crime involving sexually assaultive behavior may offer evidence of the victim’s past sexual behavior, the accused shall make a written motion in camera to offer such evidence, accompanied by a written statement of evidence setting forth the names and addresses of persons to be called as witnesses. LSA-C.E. art. 412 C(l). The motion shall be made within the time for filing pre-trial motions specified in LSA-C.Cr.P. art. 521, except that the trial court may allow the motion to be made at a later date. LSA-C.E. art. 412 D. After the motion is filed, the trial court determines the admissibility of the evidence at a hearing. LSA-C.E. art. 412 E.
Since defendant failed to file the required motion under LSA-C.E. art. 412, the trial court did not err in suppressing defense counsel’s attempt to elicit testimony regarding J.W.’s alleged sexual encounter with one of the other victims.
Based on the foregoing, this assignment of error has no merit.
In his third assignment of error, defendant contends his sentences, which total 93 years, are constitutionally excessive. He argues he has no prior convictions, he has been consistently employed, and he has limited mental capacity due to injuries he suffered in an armed robbery. The State responds that the sentences imposed are supported by the record, which shows that defendant systematically preyed on troubled teens and plied them with alcohol in order to sexually exploit them.
Defendant did not file a written motion to reconsider sentence. Although he made a timely oral motion to reconsider sentence, which was denied, defendant did not specifically state the grounds for his motion as required by LSA-C.Cr.P. art. 127881.1. He is, nonetheless, entitled to a review for constitutional excessiveness. State v. Warmack, 07-311, p. 7 (La.App. 5 Cir. 11/27/07), 973 So.2d 104, 108.
The Eighth Amendment to the United States Constitution and Louisiana Constitution Article I, § 20 prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Nguyen, 06-969, pp. 5-6 (La.App. 5 Cir. 4/24/07), 958 So.2d 61, 64, writ denied, 07-1161 (La.12/7/07), 969 So.2d 628. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lawson, 04-334, p. 6 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622. A trial judge has broad discretion in imposing a sentence, and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67, p. 5 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130.
At the sentencing hearing, the trial court heard testimony offered by the State and the defense. L.M., the mother of *1191 M.M., the victim named in counts 9 and 10, testified that defendant’s offenses against her daughter have impacted her entire family. M.M., who before her contact with defendant was a vibrant young woman, now suffered from depression and a substance abuse problem. Her family has incurred financial hardship arising from M.M.’s hospitalizations at River Oaks.
M.M. testified she was now 22 years old. The sexual assault she suffered at defendant’s hands has caused her to distrust men in general. She is uncomfortable even around the male relatives of her friends. She does not feel that a man who committed the kinds of acts defendant did should be allowed to lead a normal life.
|aiiJ.E. testified that her daughter, A.K., was one of defendant’s victims. She finds it disturbing that she ever trusted defendant, as the parent of her daughter’s friend, to keep her daughter safe. A.K. is now a ghost of her former self.
Joseph Martin testified on behalf of defendant.[10] He stated he has worked for Boh Brothers Construction with defendant for over 25 years. He also knows defendant socially and has considered him a friend. Mr. Martin testified that defendant is generous and helpful to others. Mr. Martin stated that 18 years earlier, defendant was robbed outside of a convenience store, and was hit in the head with a two-by-four. As a result, defendant was in a coma for three months. Mr. Martin felt defendant was not the same following the injury. Defendant is functionally illiterate and his mental abilities are below those of a 14-year-old.
Mr. Martin testified he knew of defendant’s relationship with J.W., but he did not know at first how young she was. J.W. often phoned defendant at work, and his co-workers assumed she was his girlfriend. Defendant eventually confessed to Mr. Martin that he was socializing with underage girls. Mr. Martin does not think defendant knew the ages of all of the girls, but he is certain that he knew J.W.’s age. He stated defendant was deeply grieved by his divorce.
Don Kenny, a New Orleans police officer, testified he is defendant’s uncle. They are close in age, grew up in the same household, and worked together at Boh Brothers for a time. Defendant cannot read or write, but he went to trade school. He is dependable, and he did not drink alcohol prior to his divorce. He stated that defendant is a goodhearted person who would help anyone. Mr. Kenny testified that if defendant were to be given parole or probation, he would live with him.
James Bates, an attorney, testified that he and Don Kenny have been friends since 1991 or 1992, and he knows defendant. Mr. Bates stated defendant is not |29very smart; he is very limited. Mr. Kenny took care of defendant for most of his adult life. Mr. Bates considered defendant to have low self-esteem, and to have a defensive, aggressive personality. He believes defendant was emotionally devastated by the divorce and would not have committed the instant offenses had he remained married.
Joy Pecot testified she has been divorced from defendant for eight years. During their marriage, defendant was a wonderful person, husband, and father. He did not drink alcohol. He is a different person since their divorce.
*1192 The judge stated that in formulating defendant’s sentences, he considered the testimony of the witnesses at the sentencing hearing. He also reviewed letters sent to him on defendant’s behalf, as well as a written victim impact statement. The judge took into account the sentencing guidelines of LSA-C.Cr.P. art. 894.1. He felt defendant was in need of correctional treatment, and that if he was not incarcerated, there was an undue risk that he would commit other crimes. The judge commented that defendant had preyed on particularly vulnerable young people and had abused the trust he developed -with the victims and their families.
Defendant complains that the total of his sentences, 93 years at hard labor, is tantamount to a life sentence. He does not contend that any sentence on its own is excessive. Thus, defendant’s objection is to the consecutive nature of his sentences. This Court has recognized that the exces-siveness of a consecutive sentence is not included in a bare constitutional review. State v. Dixon, 04-1019, p. 15 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 938; State v. Watson, 02-1154, p. 22 (La.App. 5 Cir. 3/25/03), 844 So.2d 198, 212, writ denied, 03-1276 (La.5/14/04), 872 So.2d 506.
Nevertheless, even if we consider each of defendant’s sentences, we find that neither the individual sentences nor the aggregate sentence is excessive. We [S(lnote that the individual sentences, as set forth previously in this opinion, are comparable to sentences imposed by other courts under similar facts and circumstances. Further, we have considered the entirety of the record and, based on the evidence presented, we find that the trial court did not abuse its sentencing discretion. Accordingly, this assignment of error is without merit.

ERRORS PATENT

The record was reviewed for errors patent. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The following errors requiring corrective action were noted.
The record does not show that the trial court properly notified defendant of Louisiana’s sex offender registration and notification requirements in writing as required by LSAR.S. 15:540 et seq. LSA-R.S. 15:543 A states that the trial court “shall provide written notification to any person convicted of a sex offense and a criminal offense against a victim who is a minor of the registration requirements and the notification requirements of [LSA-R.S. 15:540 et seq].” Additionally, LSA-R.S. 15:543 A states that the trial court shall use the form contained in LSA-R.S. 15:543.1 to inform the defendant of the registration and notification requirements. Accordingly, we remand the matter and order the trial court to provide defendant with the proper written sex offender notification using the form contained in LSA-R.S. 15:543.1. See State v. Williams, 09-48, pp. 19-20 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 369, writ denied, 09-2565 (La.5/7/10), 34 So.3d 860.
Also, the commitment is inconsistent with the sentencing transcript. First, the sentencing transcript shows that the trial court ordered the sentence in Count 4 be served consecutively to all other sentences. The transcript further shows that the sentence on Count 10 is to be served concurrently with the sentence on Count |S19, but consecutively to all other sentences. However, the commitment reflects that the court ordéred the sentences on Count 4 and Count 10 be served concurrently with each other. Next, the sentencing transcript shows the court ordered the sentence on Count 7 be served concurrently *1193 with the sentence on Count 6, but consecutively to all other sentences. However, the commitment indicates the sentence on Count 7 is to run consecutively to all other sentences.
Where there is a discrepancy between the transcript and the minute entry, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Accordingly, we remand and order the trial court to amend the commitment to conform to the sentencing transcript.

DECREE

For the foregoing reasons, we affirm defendant’s conviction and sentences. We remand to the trial court for amendment of the commitment to conform to the sentencing transcript. We also remand for the trial court to provide defendant with the proper written sex offender notification using the form contained in LSA-R.S. 15:543.1.

AFFIRMED; REMANDED WITH INSTRUCTIONS.

. J.W. was the victim alleged in counts 3 and 4 of the bill of information.

. A.K. was named as a victim in Count 5 of the bill of information.

. C.S. is the victim specified in counts 1 and 2 of the bill of information.

. M.D.M. was named as the victim in Count 8 of the bill of information, and A.K. was named as the victim in Count 5.

. The victim's middle initial is used here to distinguish her from the victim in Counts 9 and 10, whose initials are M.M.

. A.K. is the victim referenced in Count 5.

. C.S. is the victim referenced in Counts 1 and 2.

.A.K. is the victim referenced in Count 5.

. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

. Mr. Martin actually testified prior to the sentencing hearing, and his testimony was perpetuated for sentencing purposes.