# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-296

**STATE OF LOUISIANA**

**VERSUS**

**KEVIN DEE GILDHOUSE**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 09CR123773
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

**********

## JIMMIE C. PETERS
## JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and John E. Conery, Judges.

**AFFIRMED.**

**Michael Harson**
**District Attorney**
**Fifteenth Judicial District**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    State of Louisiana

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Kevin Dee Gildhouse**

**Patrick D. Magee**
**Voorhies & Labbe**
**P. O. Box 3527**
**Lafayette, LA 70502-3527**
**(337) 232-9700**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**Kevin Dee Gildhouse**
**Louisiana State Penitentiary**
**Walnut 2**
**Angola, LA 70712**
**IN PROPER PERSON**

**PETERS, J.**

The defendant, Kevin Dee Gildhouse, appeals his conviction for second degree murder, a violation of La.R.S. 14:30.1. For the following reasons, we affirm his conviction in all respects.

This criminal charge arises from the shooting death of Wallace Badeaux in Lafayette, Louisiana, on Monday evening, February 23, 2009. In a single True Bill returned on April 8, 2009, a Lafayette Parish Grand Jury indicted the defendant and a co-defendant, Aaron Francois, for armed robbery, a violation of La.R.S. 14:64, and first degree murder, a violation of La.R.S. 14:30, in connection with Mr. Badeaux's death.

On the motion of the defendant, the trial court severed the charges against the two defendants on November 9, 2009. The basis of this motion was that the defense of each co-defendant was to be that the other committed the offense.

On January 20, 2011, the State of Louisiana (state) amended the indictment by reducing the first degree murder charge against both men to second degree murder, a violation of La.R.S. 14:30.1(A)(2)(a).[1] The three-day trial on the merits began on October 8, 2012, and ended with a jury verdict finding the defendant guilty on both counts. Immediately after the jury returned its verdict, the trial court vacated the armed robbery conviction because the state's case against the defendant for second degree murder was based on the felony-murder provision of La.R.S. 14:30.1 and, therefore, the armed robbery offense was an element of proof in the second degree murder charge. The defendant then waived the delays for

_____

[1] The motion to amend the indictment and the order executed by the trial court allowing the amendment erroneously refers to the charging statute as La.R.S. 14:30.1(2)(a). However, it is not disputed that the state intended to amend the indictment to reflect a charge of second degree murder under La.R.S. 14:30.1(A)(2)(a). Additionally, La.R.S. 14:30.1 has been amended since the time of this offense, and its paragraphs have been renumbered such that the statute no longer contains a paragraph designated as (A)(2)(a). However, the amendment did not change the particulars of the offense charged and has no effect on this litigation.

sentencing, and the trial court sentenced him to serve life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence.

The defendant then perfected this appeal, raising four assignments of error:

1. The evidence admitted at the trial of this case, when viewed under the *Jackson v. Virginia* standard, was insufficient to prove beyond a reasonable doubt that Kevin Gildhouse either directly committed or was a principal to either the armed robbery or second degree murder of Wallace Badeaux.

2. The trial court erred in concluding that: 1) La. Code Crim. P. art. 770 was inapplicable; 2) individual questioning of the jurors was not warranted to ascertain whether any had seen and/or been influenced by a notice which was posted immediately outside the courtroom, within view of the jury, which contained reference to inadmissible other crimes evidence; and/or 3) a mistrial was improper.

3. The trial court erred in declining to permit the defense from introducing evidence of Aaron Francois'[s] conviction for the second degree murder of Wallace Badeaux, in violation of his Sixth Amendment right to present a defense.

4. The trial court deprived Appellant of several constitutional rights guaranteed under the U.S. Constit. Amendments IV and XIV and La. Constit. art. I, § 16 - the right to full cross-examination, the right to present a complete defense and the right for a reliable determination of his guilt - when it prohibited the defense from questioning a State witness who had taken the statement of his co-defendant about whether the co-defendant's inculpatory statement contained discrepancies.

### *Assignment of Error Number One*

In this assignment of error, the defendant asserts that the evidence admitted at trial, when viewed under the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), was insufficient to prove beyond a reasonable doubt that he either directly committed or was a principal to either the armed robbery or second degree murder of Mr. Badeaux.

Our standard of review in a sufficiency of the evidence claim is well-settled. We must determine "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a

reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821 and does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521.

Stated another way, the appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact[,]" but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727.

Louisiana Revised Statutes 14:30.1 provides that second degree murder may be committed under a number of different factual scenarios. In this case, when the state amended the indictment from first degree to second degree murder, it specifically charged the defendant under La.R.S. 14:30.1(A)(2)(a), the felony-murder section. At the time of the offense, this section read in pertinent part that "[s]econd degree murder is the killing of a human being . . . [w]hen the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery . . . even though he has no intent to kill or to inflict great bodily harm." Louisiana Revised Statutes 14:24 provides in pertinent part that "[a]rmed robbery is the taking of anything of value belonging to another from the person of another . . . while armed with a dangerous weapon." Additionally, "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting

3

the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La.R.S. 14:24.

Thus, in order to convict the defendant of the felony-murder provision of the second degree murder statute, the state had to prove beyond a reasonable doubt that he committed an armed robbery of Mr. Badeaux, or that he aided or abetted in the commission of the armed robbery of Mr. Badeaux, and that Mr. Badeaux was killed during the course of that armed robbery. *See State v. Goodley*, 00-846 (La.App. 3 Cir. 12/11/02), 832 So.2d 1165.

The evidentiary record establishes that Mr. Badeaux was a taxi cab driver in Lafayette, Louisiana, and that shortly before 8:00 p.m. on the evening of February 23, 2009, he picked up the defendant and Francois at the parking lot of Gloria's Lounge in the city. On the instructions of one of the two men, he transported them to a location near the Fox Run apartment complex in Lafayette. There he was robbed of his vehicle keys and less than $100.00 in collected fares, and shot in the neck with a .357 Magnum revolver. The fatal shot entered the back of his neck on the left side, exited his right cheek near the angle of the mandible, and continued traveling downward toward the right-front passenger door.

Pictures taken at the scene established that the front seat configuration of the taxi was not a bench seat running the width of the vehicle as one might expect in a regular taxi. Instead, the front passenger area contained bucket seats with an open console area between the seats. Additionally, the pictures revealed a blood distribution pattern primarily about the headrest area of the front driver's seat and in the passenger side area immediately behind the driver. The pictures further show that the driver's headrest and the area immediately to the right of the headrest appear to be soaked in blood; the floorboard of the back seat behind the driver's seat contained a large pool of blood; both sides of the back of the driver's seat

reflect ribbons of blood flowing toward the back; and the back seat immediately behind the driver's seat contains ribbons of blood flowing toward the back; and the back seat from the center to the left passenger seat contains significant blood splatter. On the other hand, the pictures reflect little splatter in the middle of the back seat and no splatter in the back seat behind the passenger-side front seat.

The defendant does not dispute that he was present when the robbery and murder occurred, but asserts that he did not commit either offense. Instead, he places all of the blame on his co-defendant, Aaron Francois. The jury considered the evidence presented and reached a different conclusion. The defendant asserts that the evidence was not sufficient for the jury to reach this conclusion.

Other than the perpetrator or perpetrators, there were no eyewitnesses to the offenses.[2] When Sergeant Christopher Cogburn of the Lafayette Parish Sheriff's Office arrived on the scene in response to a 911 call, he observed Mr. Badeaux's body in the driver's seat and blood splatter on the driver's side of the vehicle and in the previously described locations in the back seat. During this initial investigation, Sergeant Cogburn recovered the bullet from the front-passenger door as well as lead fragments from the front-passenger seat.

The investigation at the scene did not produce any direct evidence to connect the defendant or Francois to the offenses. However, the investigating team was able to trace the location of the last telephone call received by Mr. Badeaux to a Wal-Mart store on Pinhook Road in Lafayette. When the defendant and Francois appeared on surveillance video from that store, they became persons of interest in the investigation. On March 2, 2009, both men were taken into custody and, on that same day, questioned by law enforcement personnel. The statement given by

_____

[2] Two men in a Fox Run apartment heard a single gunshot at the approximate time of the offenses and, when they went to investigate, observed two unidentified men fleeing the scene.

the defendant to the investigating officers was read to the jury and constitutes a significant part of the state's case.[3]

The defendant told the officers that he, his girlfriend (Margaret Sanchez), and her one-year-old child had only been in the Lafayette area for approximately two weeks before the robbery and murder. They had traveled from San Antonio, Texas, to Lafayette, and at some point after arriving in the city, moved into an apartment with Katelyn Foster and Aaron Francois. Katelyn was Margaret's best friend and Francois's girlfriend.

According to the defendant's statement to the officers, on the day of the robbery and murder, everyone in the house got into Margaret's blue Ford Explorer and brought Katelyn to work at the Wal-Mart store on Ambassador Caffery Parkway in Lafayette. He was not sure what time the trip began, but because Katelyn's shift was scheduled to end that day at 8:00 p.m., they probably left the apartment at mid-morning. After dropping Katelyn off, they returned to the apartment where Francois asked the defendant to drive him to Broussard, Louisiana to see a former girlfriend. Not wanting to hurt Katelyn's feelings, the defendant told Francois that he could not do so because he only had a quarter tank of gasoline in the Ford Explorer, and he needed to preserve the remaining fuel to take Margaret to a job interview in the next few days. However, he did offer to take Francois to his aunt's house in Lafayette.

The defendant told the officers that sometime between 5:00 and 7:00 p.m., the defendant, accompanied by Francois, Margaret, and the baby, loaded into Margaret's Ford Explorer and took Francois to his aunt's house off Pinhook Road in Lafayette. When they arrived, no one was home, and Francois then asked the

---

[3] The transcript contains a narrative of the oral statement and the headings identifying the defendant's interrogator seems to suggest that all of the questions were asked by Lafayette Parish Sheriff's Detective William Arceneaux, Jr. However, the content of the questions makes it clear that more than one officer participated in questioning the defendant.

defendant to take him to a nearby Texaco convenience store so he could call a taxi to take him to Broussard.

In his statement, the defendant told the officers that when they arrived at the convenience store, he went to use the bathroom, and Francois went inside to borrow a cell phone from an employee he knew. The defendant arrived back at the vehicle before Francois, and when he did return to the vehicle, he told the defendant that the taxi would be there in fifteen to twenty minutes, but if he would take him to Broussard, his former girlfriend would give him some gas money. The defendant accepted the proposition and drove Francois to Broussard. As was the case with the trip to the aunt's house, no one was home at the girlfriend's house.

According to the defendant, they then returned to Lafayette and traveled to the Ambassador Caffery Wal-Mart location intending to wait for Katelyn to finish her shift. When they arrived at the store, Katelyn informed them that she would not complete her shift until 9:00 p.m. and that she would find another ride home.

At this point in the interview, the defendant told the officers that everyone returned to the apartment and prepared dinner. When questioned directly on other stops they may have made, the defendant initially denied going anywhere other than those places he had described. However, when pressed on this issue, he recalled that before going to the convenience store, they had stopped at a Wal-Mart store on Pinhook Road "[j]ust to look around[.]" He suggested that this stop occurred between 5:00 and 6:00 p.m., and that he, Margaret, and the baby separated from Francois after entering the store. The defendant stated that neither he nor Francois bought anything.

Next, the officers confronted the defendant with surveillance video evidence which established that both he and Francois were together at the Pinhook Wal-Mart store at 7:41 p.m. on the day of the robbery and murder. He did not dispute

7

the accuracy of this evidence, but attempted to explain the absence of Margaret and the child in the surveillance evidence by asserting that he had been mistaken before when he told the officers that Margaret and the child had accompanied him into the Pinhook Wal-Mart store; and that it was the Ambassador Caffery Wal-Mart store where she and the child accompanied him inside. With regard to the Pinhook Wal-Mart store stop, he then asserted that Margaret and the child remained in the Ford Explorer.

When the officers pressed the defendant concerning whether or not he was in the taxi at time of the robbery and murder, he first asserted that neither he nor Francois rode in a taxi that night. When confronted with the photographs of Mr. Badeaux's body, the defendant insisted that he had nothing to do with any murder and had never seen the victim. However, after further intense questioning by the officers, the defendant blurted out that Francois "f---ing blew his head off." The defendant then went on to state in expletive-filled language that they had been in the taxi; that Francois shot Mr. Badeaux; that he had no prior knowledge of Francois's plans; that he only saw the gun in Francois's hand as he was exiting the taxi; and that he was about to walk away when he heard the weapon discharge.

After having admitted that he was in the taxi at the time of the robbery and murder, the defendant explained that he was occupying the back passenger seat on the right side and that Francois was sitting immediately behind Mr. Badeaux. When asked about the armed robbery, the defendant initially stated that he did not see Francois take any money from Mr. Badeaux.

It was at this point that everything began to completely unravel for the defendant and he began totally revising his story. He changed his prior statement to assert that only he and Francois went to the Pinhook Wal-Mart store that evening and that Francois did in fact call for a taxi to pick them up at a nearby bar

(Gloria's Lounge). When the taxi arrived, Francois told the driver that he wanted to be taken to Broussard, but then instructed Mr. Badeaux to first drive toward the Fox Run apartment complex so that he could stop at his aunt's house and obtain some money and beer. When the taxi came to a stop at the Fox Run apartment complex, the defendant heard a "click" and saw that Francois was pointing a gun at the back of Mr. Badeaux's head. He asked Francois what he was doing, and Francois responded that they needed to "get some money." Wanting no part of what was going on, the defendant began to exit the taxi on the passenger side. As he stepped out, he heard the gunshot. At this point, both the defendant and Francois began running and did not stop until they returned to Gloria's Lounge where they had left the Ford Explorer.

The officers next asked the defendant to tell them the location of the murder weapon. The defendant responded that Francois had disposed of the gun and that he did not know its location. However, the defendant continued to revise other aspects of his prior statement.

Next the defendant told the officers that only he and Francois traveled to the Ambassador Caffery Wal-Mart to pick up Katelyn at the end of her shift, and when Katlyn informed them that she had extended her shift and would get a ride home, they returned to the apartment. When he first encountered Margaret at the apartment, he told her only that he "had robbed some fool." While not mentioning the murder, the defendant did instruct Margaret that "if something [came] down," she was to say she was in the car with them and give him an alibi.

The officers next turned their attention to a discussion of the clothes the defendant had worn on the night of the robbery and murder. They were particularly interested in a black leather jacket which had been found that same day a short distance from the robbery and murder scene. However, they did not inform

9

the defendant that the jacket had been recovered. The defendant acknowledged that he had worn a black leather jacket borrowed from Francois that evening, but that he had given it back when they returned to the apartment. He stated that Francois had disposed of it at a later time. Later in the questioning, he specifically denied disposing of the jacket while fleeing the scene.

Responding to more specific questions concerning what happened at the scene of the robbery and murder, the defendant told the officers that Francois had the weapon in his left hand, and he heard Francois tell Mr. Badeaux to give him the money. Although he did not see Francois steal any money, he knew that Francois had money after the offenses because he purchased $10.00 in gasoline for the Ford Explorer the next day. The defendant also admitted that earlier in the evening, he and Francois had stolen two pairs of baseball gloves from the Pinhook Wal-Mart store. He told the officers that Francois disposed of the gloves at the same time he disposed of the weapon. He heard Francois talking about disposing of the weapon in a coulee in the area.[4]

When taken into custody, the defendant had on his person a .38 revolver and some .38 cartridges. Early in the questioning process, the defendant told the officers that the weapon belonged to Francois and that Francois had asked him to carry it as they walked outside the house where the officers were waiting. Initially, the officers did not pursue this line of questioning any further. However, as the defendant's prior statement continued to unravel, the officers informed him that Francois had told them that the defendant was the person who shot Mr. Badeaux. More specifically, they told the defendant that Francois had stated that the defendant had both the .357 Magnum revolver and the .38 revolver on his person

_____

[4] The testimony in the record describes a coulee as a big ditch.

10

the evening of the robbery and murder, and that he had robbed and shot Mr. Badeaux with the .357 Magnum revolver while holding Francois at bay with the .38 revolver. The defendant emphatically denied these assertions. He repeated his version of what occurred, and he added to his statement for the first time that when the fatal shot was fired, blood splattered on the left side of his face from his chin to his hairline. Also for the first time, the defendant stated that before he was shot, Mr. Badeaux handed the taxi keys to Francois.

The officers then returned to questions concerning the location of the murder weapon. After initially reaffirming his previous statement that he did not know its location, the defendant changed his story and told the officers that while he could not tell them where the weapon was, he could show them. At the request of the officers, the defendant drew a map to a bridge which he described as being close to Katelyn's parents' home. He told the officers that he had driven Francois to that location, where Francois disposed of the .357 Magnum revolver and some bullets. This trip, he told the officers, occurred two days before they were taken into custody. According to the defendant, they drove to the location after dark, parked the vehicle with the emergency blinkers flashing, and Francois left to dispose of the items. Before he left the defendant at the vehicle, Francois wrapped the weapon in a cloth, and after five or six minutes, returned without the weapon or the cloth.

The defendant later accompanied the officers to a coulee near Cameron Street, on the west side of Scott, Louisiana. There the officers recovered a Taurus .357 Magnum caliber revolver, some .38 caliber rounds, one .357 caliber round, and a black and white bandana from the brush in that area. The defendant identified the bandana as the cloth Francois wrapped around the weapon when he

disposed of it. Scientific testing established that the recovered weapon was the murder weapon.

While the defendant did not mention in his statement that he had come in contact with anyone else while at the location where Francois disposed of the murder weapon, he had actually had an encounter with Lafayette Parish Deputy John Bourque. Deputy Bourque testified that while on patrol in the Scott area between 10:30 and 10:50 p.m. on February 27, 2009, he came across a vehicle parked near a coulee on the westbound side of Cameron Street with its hazard lights on. When he asked the driver, who was standing outside the vehicle, if he needed help, the driver responded that he did not; and that his girlfriend was in the back of the vehicle mixing a bottle for a baby. At trial, Deputy Bourque identified the defendant as the driver he encountered. Further investigation by the Lafayette Parish Sheriff's Office established that between 10:00 and 10:45 p.m. on that same evening, Francois had entered a local hospital, complaining of vomiting and stomach problems.

After the state rested its case, the defendant testified and presented evidence in his defense. In his testimony, he admitted he had lied multiple times in the statement he gave on March 2, 2009, but asserted that at trial he was telling the truth.

The defendant's testimony concerning the facts of the robbery and murder itself changed little from his statement. He did state for the first time that he heard Francois say something to Mr. Badeaux about both the money and keys, and that he saw Mr. Badeaux's head being pushed forward by the weapon before it discharged. He recalled specifically that he was in the process of sliding out of the taxi and had his right foot on the ground when the weapon discharged. Additionally, he stated that Francois's finger did not slip on the trigger and the

discharge of the weapon was not an accident. He based this belief primarily on "the way [Francois] was acting afterwards."

In his trial testimony, the defendant asserted that he and Francois were alone when they stopped at the convenience store, the Pinhook Wal-Mart store, and the Ambassador Caffery Wal-Mart store on the afternoon and night of the robbery and murder. He also stated that the last stop occurred after the robbery and murder. Still, he specifically denied that he and Francois planned to commit armed robbery or murder that night.

The defendant testified that he and Francois went to the Pinhook Wal-Mart store to look at a stereo system not carried at the Ambassador Caffery store. While the defendant examined the stereo system, Francois stole three pairs of baseball gloves that the defendant understood were to be used at an upcoming outdoor event planned with Francois's family[5]. The defendant testified that as they exited the store, Francois stopped to talk to a store employee in the parking lot and he went to their vehicle.

According to the defendant, Francois joined him and informed him that he had ordered a taxi to pick them up at Gloria's Lounge where they could leave the Ford Explorer without fear of it being towed. Francois wanted the defendant to accompany him to Broussard because he was concerned that members of his former girlfriend's family might want to cause trouble. For the same reason, Francois did not want to travel to Broussard in the Ford Explorer. They drove to Gloria's Lounge and when the taxi arrived, both men got into the rear seats with Francois sitting behind the cab driver Mr. Badeaux. Francois told Mr. Badeaux that his aunt lived in the Fox Run apartments and he needed to stop there to "grab

_____

[5] The defendant previously stated that Francois had stolen two pairs of gloves, but he changed his testimony at trial to state that the correct number stolen was three.

some money" and if Mr. Badeaux would accommodate them he would receive a good tip.

According to the defendant, when the weapon discharged, he felt blood on the side of his face and in his mouth, but that blood did not get on the black leather jacket he was wearing. He testified that, instead of running directly back to Gloria's Lounge as he had asserted in his statement, he first ran to another apartment complex with Francois following him. Francois passed him and told the defendant to follow him. They then traversed a field after jumping two fences, and during the flight he removed the leather jacket and dropped it and the baseball gloves. He also testified that sometime during the flight Francois tried to give him the .357 Magnum revolver but he refused to take it.

The defendant explained his statement to Margaret that he had "just robbed some fool" by stating that Francois was standing in the doorway of his bedroom at the time and "I couldn't just say, oh, Aaron robbed somebody and killed somebody and I didn't have nothing to do with it."

In his testimony, he also admitted that he had lied about attempting to dispose of the murder weapon. He testified that Francois had originally planned to go with him to dispose of the weapon, but that he became sick and the defendant dropped him off at a hospital before traveling to the location where he discarded the weapon and the other items found at the scene.

Seth Robert Champagne[6] and Gregory Mayon[7] were both incarcerated at the Lafayette Parish Correctional Center at the same time as Francois and each testified that they had conversations with Francois wherein he admitted shooting

---

[6]Champagne was serving time for simple burglary and had also been in trouble as a juvenile.

[7]Mayon was serving time for "[a]ltering a script of a CDS" and "ha[d] plenty" of other felony convictions. At the time of trial, he was incarcerated at Angola State Prison.

Mr. Badeaux. Both testified that Francois told them he had been the one to pull the trigger and that his finger had slipped. Champagne shared the content of these conversations only with the defendant's investigator; and Mayon did not question that Francois shot Mr. Badeaux, but expressed serious doubts concerning Francois's assertions that the shooting was an accident. In his testimony, he stated that "[y]ou can't accidentally pull a .357. There's too many pounds of pressure on the trigger. Five pounds, to be exact."

Francois did not testify at trial. The state and the defendant stipulated that he was unavailable to testify because if called, he would exercise his Fifth Amendment right to remain silent. Francois had already gone to trial when the defendant's trial began, and his conviction for the second degree murder of Mr. Badeaux was on appeal.

The investigation of these offenses produced very little physical evidence. Neither Francois's nor the defendant's fingerprints were found in the taxi, although Sergeant Cogburn testified that he would not expect to find any if the perpetrator or perpetrators were wearing gloves. DNA testing of the recovered baseball gloves produced mixed results. One glove did not have sufficient DNA to test; another tested positive for Francois's DNA as a major contributor, and for a second unidentified individual as a minor contributor; and another contained a mixed DNA profile from three contributors. In the last glove tested, the best that could be said was that the results established that the defendant could not be excluded as a contributor. DNA testing in the taxi in the area behind the driver produced nothing to establish the positions of either the defendant or Francois.

The evidentiary record further establishes that Francois had a card with the taxi company's telephone number on it in his wallet when he was taken into custody and that he made telephone calls from the convenience store and the

Pinhook Wal-Mart store to the taxi company on the night of the robbery and murder.

With regard to the ownership of the murder weapon, the evidentiary record establishes that it was taken from the home of Francois's cousin, Tim Ducote. Francois had lived with his cousin from 2006 through 2009, and it was not until after the defendant and Francois were taken into custody that Mr. Ducote realized that the weapon was missing. Although Mr. Ducote had met the defendant and did not believe his cousin would have taken the weapon, Detective Arceneaux testified that he had no evidence to suggest that the defendant knew the location of the weapon.

The defendant asserts that the evidence is insufficient to support the verdicts rendered by the jury. As previously stated, this court cannot substitute its appreciation of the evidence for that of the jury. *Pigford*, 922 So.2d 517. We are limited in our review and must view the evidence in a light most favorable to the state; and if any rational trier of fact could have found that the state proved the elements of the offenses beyond a reasonable doubt, we must affirm the conviction. *Leger*, 936 So.2d 108. In performing that review in this matter, we find that a rational trier of fact could have found that the state met its burden of proof.

What is established by the record is that on the evening of February 23, 2009, the defendant and Aaron Francois were in the back seat of Wallace Badeaux's taxi parked on a street near the Fox Run apartment complex in Lafayette, Louisiana. The record further established without contradiction that one of the two men shot Mr. Badeaux in the back of the neck while committing an armed robbery of Mr. Badeaux and that the victim died of the gunshot wound. Thus, the basic elements of felony murder, as it was defined in La.R.S.

16

14:30.1(A)(a) at the time of the offense, were established beyond a reasonable doubt.

The only fact at issue relates to whether the defendant was a principal in the commission of that offense. That is to say, did the state prove beyond a reasonable doubt that the defendant either directly participated in the armed robbery, aided and abetted in its commission, or directly or indirectly counseled or procured another to commit the offense. La.R.S. 14:24.

The evidence clearly established that the individual sitting behind Mr. Badeaux when the taxi came to a stop at the Fox Run apartment complex was the shooter in the robbery and murder. The defendant argues that a rational trier of fact could come to no other conclusion but that Francois was the individual sitting in that position. We disagree.

The pictures depicting the distribution pattern of Mr. Badeaux's blood clearly established that an individual exiting the vehicle from the back seat passenger side would not be exposed to any significant blood splatter. Additionally, that same distribution pattern clearly establishes that the shooter had exited the passenger seat behind the driver before the fatal shot was fired. Had he still been in the seat, the blood splatter would have been absorbed by his clothes and would not have been present on the seat as shown in the photographs. A rational trier of fact could have concluded that the back spray from the projectile entering Mr. Badeaux's neck would have struck the shooter in the face, and that the back door and/or back of the driver's seat would have protected the shooter's clothes from being splattered with blood. In other words, a rational trier of fact could have concluded that the defendant was the shooter.

Other evidence presented by the state established that the defendant and Francois traversed the City of Lafayette on the afternoon and early evening of

17

February 23, 2009, primarily in search of a source of money to fund Francois's desire to see his former girlfriend in Broussard, Louisiana. When Francois made arrangements for a taxi, it would have been obvious to a reasonable trier of fact that neither man had the money to pay for the fare to Broussard. Additionally, while the defendant claimed to have had no knowledge that Francois was armed with a .357 Magnum caliber revolver despite having spent the day with him, a reasonable trier of fact could conclude otherwise.

The defendant asserted in his March 2, 2009 statement that he was exiting the taxi on the passenger side when he heard the shot that killed Mr. Badeaux and that he immediately started running away from the scene. A rational trier of fact could reasonably conclude that the defendant was still in the vehicle in close proximity to Mr. Badeaux given (1) that he told the officers that Francois had "f---ing blew his head off"; and (2) that he had been splattered with blood from his chin to his hair, but nowhere else. These assertions would cause a rational trier of fact to conclude that he was in a position sufficiently different from exiting the taxi.

It is also undisputed that the defendant and Francois fled the scene on foot and that the defendant disposed of the black leather jacket he wore that night, as well as a pair of baseball gloves, "within a stone's throw" from the scene of the crime. While DNA evaluation of the gloves could only establish that the defendant could not be excluded as one of the three contributors found in the gloves, a rational trier of fact could conclude that the use of the gloves by the defendant would explain why no fingerprint evidence of his presence in the taxi existed. Additionally, although the defendant claimed the gloves were stolen for Francois's family function, a reasonable trier of fact could conclude that the reason the defendant had possession of a pair gloves when he fled the scene of the robbery

18

and murder was because he used them to hide his identity while committing the offenses.

The evidence also establishes that at no time did the defendant contact law enforcement about the murder, nor did he remain behind to assist Mr. Badeaux. He told his girlfriend that he "had robbed some fool," and disposed of the murder weapon.

In *Goodley*, 832 So.2d 1165, "[t]he defendant drove the getaway car, provided the murder weapon, and accepted proceeds from the crime[]" where someone else shot and killed the victim. *Id.* at 1168. The defendant, however, contended he went into a store, found the attendant sleeping, and went back outside. His accomplice grabbed a rifle from the car and entered the store. The defendant said he panicked and started the car, but he denied being suspicious that a crime was being committed. While he waited outside, he heard a gunshot. His accomplice returned to the car with an old pistol and cash, told the defendant he had robbed the store, and gave the defendant fourteen dollars.

A witness contended the defendant told her he was inside the store during the robbery and told his accomplice not to shoot. Another witness testified the defendant told him they had both robbed the store, and his accomplice had killed someone while the defendant was outside. This court found the defendant's first version of the events supported a finding that he was a principal to an armed robbery during which a killing occurred and affirmed his conviction.

Evidence showed the defendant "blew off" a discussion about killing the victim the night before the murder in *State v. Clarkson*, 11-933 (La.App. 3 Cir. 3/7/12), 86 So.3d 804, *writ denied* 12-788 (La. 9/28/12), 98 So.3d 826. The defendant did nothing to extricate himself from the situation and did not report the plans. He saw the actual shooter fire one of two shots but made no effort to help

the victim even though he did not know if the victim was dead. He encouraged others involved to leave the scene, participated in taking some of the victim's possessions, and watched the shooter bury the murder weapon. He left town without reporting anything. When questioned about the murder, the defendant lied to investigators and only admitted his knowledge of it a week later when confronted with evidence against him. This court found his actions "constitute[d] aiding or abetting in the commission" of the murder and satisfied the elements of being a principal to second degree murder. *Id.* at 814. We find no merit in this assignment of error.

### *Assignment of Error Number Two*

The facts giving rise to this assignment of error came to the attention of the trial court after the jury had retired to deliberate its verdict. Immediately before sending the jury to deliberate, the trial court released Brandy Gerard as an alternate juror. While the jury was still deliberating, Ms. Gerard contacted the defendant's counsel and informed him that as she left the courtroom, she saw a list of charges against the defendant posted on a bulletin board adjacent to the courtroom. She informed the defendant's counsel that in addition to the armed robbery and second degree murder charges for which the defendant was being tried, the list included an aggravated escape charge.

When informed of this posting, the defendant's counsel brought Ms. Gerard before the trial court and she took the witness stand to make a record of what she had observed. Ms. Gerard testified concerning the content of the list, the fact that she never saw it before being discharged as an alternate juror, her belief that none of the other jurors saw it during the trial, and that "[i]t was never discussed" while she was with the jury.

20

The defendant's counsel introduced a copy of the posted list. The caption of the list identifies it as the final criminal court docket for the trial court's schedule beginning on October 8, 2012, and has three matters listed. The first is the matter currently before us and the posting identifies Kevin Dee Gildhouse as the defendant, and second degree murder and armed robbery as the charges to be tried. The next entry also identifies Kevin Dee Gildhouse as the defendant, but is referenced to a different docket number and lists the charge to be tried as aggravated escape. The third entry is marked through with a diagonal line but identifies Norman Gene Roberts as the defendant, is referenced to a third docket number, and lists two charges of negligent homicide as being the charges to be tried.

After hearing Ms. Gerard's testimony, the trial court noted that the bulletin board is used by the other courtrooms to post their schedules as well, and that documents from these other courtrooms were posted earlier in the day. However, it was stipulated that when Ms. Gerard noticed the posting, it was the only one on the bulletin board.

Initially, the trial court indicated that each juror would be examined separately after the verdict was returned to determine exposure to the information. However, after taking a recess, the trial court concluded that an admonition to the jury was appropriate. Specifically, the trial court suggested that it would inform the jurors "that, if any of them saw anything out in the hallway related to this case, that they are to disregard that – anything posted in the hallway, they are to disregard that information. Okay? Anything posted on the bulletin board related to this case, they're to disregard it." The defendant's counsel requested that the trial court not make the statement to the jury, fearing that the admonition "may, in and of itself, raise suspicions" toward the defendant.

When the trial court rejected a motion for a mistrial, the defendant objected to the continuation of the trial based on the possible contamination of the jury by the reference to the aggravated escape offense, and again requested that the jurors be interrogated on this issue. The trial court denied this request, and stated that the defendant was only entitled to an admonition which he had declined.

As stated in *State v. Miller*, 10-718, p. 13 (La.App. 5 Cir. 12/28/11), 83 So.3d 178, 187-88, *writ denied*, 12-282 (La. 5/18/12), 89 So.3d 1191, *cert. denied*, __ U.S. __, 133 S.Ct. 1238 (2013), (citations omitted):

> A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion.

The defendant's basis for the requested mistrial was La.Code Crim.P. art. 770(2), which provides as follows:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official during the trial or in argument, refers directly or indirectly to:
> . . . .
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.

Additionally, "[a]n admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial." *Id.*

We find no merit in the defendant's argument that the trial court erred in not granting a mistrial based on La.Code Crim.P. art. 770(2). While the posting may have been accomplished by a court official, it does not qualify as "a remark or comment" on another crime alleged to have been committed by the defendant, nor was it "made within the hearing of the jury" as contemplated by La.Code Crim.P.

art. 770(2). The trial court did not err in concluding that this Article was not applicable to this factual scenario.

Having found that La.Code Crim.P. art. 770(2) does not require a mandatory mistrial in this matter, we also find no abuse of discretion in the trial court's refusal to grant that relief on any other ground. We find no merit in this assignment of error.

### *Assignment of Error Number Three*

In this assignment of error, the defendant asserts that his right to present a defense as guaranteed by U.S. Const. amend. VI was violated in that he was not allowed to introduce evidence of Francois's conviction for the same offense. As previously stated, at trial the state and the defendant stipulated that Francois was unavailable to testify because, if called to testify, he would exercise his right against self-incrimination as guaranteed by U.S. Const. amend. V.

The defendant argues that because he used the same evidence Francois used in his trial, and that because the issue of guilt or innocence was based on who was telling the truth, the fact of Francois's conviction was relevant and highly probative evidence that should have gone to the jury. The state asserted that Francois's conviction was not relevant to this trial because both prosecutions were based on both the felony murder portion of La.R.S. 14:30.1, and it did not matter who actually fired the fatal shot.

In rejecting the defendant's request to make the jury aware of Francois's conviction, the trial court noted that the jury trying Francois found him guilty under the theory of felony murder, and this verdict did not necessarily indicate the jury found Francois was the shooter. Thus, the trial court believed the evidence of Francois's conviction was irrelevant and would confuse the jury. The defendant's counsel did not object to the trial court's ruling.

23

Additionally, although the parties spoke of the co-defendant evidence from the beginning of the trial to the end, the discussion was in vague terms and the specific evidence was never identified. On appeal, the defendant does not identify what evidence he wants to offer. Furthermore, the defendant's entire defense was based on Francois's commission of the crimes and he introduced evidence of this assertion through the testimony of the two inmates who testified that Francois told them he had shot Mr. Badeaux. The defendant himself testified Francois committed the robbery and the murder without his assistance.

Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401. Evidence of Francois's conviction would only establish his guilt, not the defendant's innocence. This is not a situation where either Francois or the defendant is guilty to the exclusion of the other. Rather, this is a situation where both could be guilty. Evidence of another jury's decision about another defendant's guilt is not relevant to the issue of this defendant's guilt or innocence. Further, the record does not show what evidence would have been submitted had the defendant been allowed to offer it. We find no merit in this assignment of error.

### Assignment of Error Number Four

In this assignment of error, the defendant asserts that the trial court's ruling prohibiting him from questioning Detective Arceneaux about discrepancies in Francois's custodial statement deprived him of the right of a full cross-examination of the witness and thereby prohibited him from presenting a complete defense as guaranteed by U.S. Const. amend. IV and La. Const. art. I, § 16.

When his counsel questioned Detective Arceneaux concerning inconsistencies in Francois's custodial statement, the trial court sustained the

state's relevancy objection. The defendant's counsel failed to preserve an objection to the trial court's ruling and proceeded with a different line of questioning. Later in the cross-examination of Detective Arceneaux, the defendant's counsel again asked him if he found any inconsistencies in Francois's statement. The state again objected on the grounds of relevance, and the trial court again sustained the objection. Once again, the defendant did not object to the trial court ruling.

Louisiana Code of Criminal Procedure Article 841 requires a party to make a contemporaneous objection to any perceived error of the trial court. Without the objection, the grounds for it are waived. *See State v. Pecot*, 10-261 (La.App. 5 Cir. 12/14/10), 54 So.3d 1174, *writ denied* 11-0123 (La. 5/27/11), 63 So.3d 996. We find that the defendant failed to preserve his right to assert this assignment of error on appeal.

## DISPOSITION

For the foregoing reasons, we affirm the defendant's conviction in all respects.

**AFFIRMED.**